**TANDY CORPORATION,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 79–1289.

United States Court of Appeals,
Fifth Circuit.

Sept. 29, 1980.

Allan Howeth, Whitfield J. Collins, William D. Ratliff, III, Fort Worth, Tex., for plaintiff-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Ch., App. Sec. Tax Div., Dept. of Justice, Washington, D. C., Gary R. Allen, Tax Div., Donald B. Susswein, Dept. of Justice, Washington, D. C., for defendant-appellee.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

This case presents the question whether a corporation is entitled to deduct, for federal income tax purposes, the accrued interest and bond premium that would have been payable to holders of the corporation's convertible debentures called for redemption if such holders had not converted such debentures into common stock of the corporation prior to the redemption date. The district court held that the corporation was not entitled to deduct such accrued interest or bond premium, 1979-1 Tax Cas. (CCH) ¶ 9160 (S.D. Tex. 1979), and we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

In May 1969, Tandy Corporation ("Tandy") issued and sold $40,000,000 aggregate principal amount of 5% Convertible Subordinated Debentures due 1989 (the "Debentures"). The Debentures were issued pursuant to an Indenture dated as of May 1, 1969 (the "Indenture"), between Tandy and Chemical Bank, as Trustee. There are several definitions and provisions in the Indenture that are relevant to the issue before this court and they are set out in an appendix to this opinion. The terms defined in the Indenture and used in this opinion are used herein as therein defined. The definitions and provisions will be discussed in greater detail below. Briefly, the Indenture provides that Tandy has the option to redeem all or any part of the Debentures at any time prior to Maturity by payment of the applicable percentage of the principal amount thereof set forth in the Indenture, together with accrued interest to the Redemption Date. The initial applicable percentage of the principal amount is 105%, and the percentage declines over the lifetime of the Debentures to 100%. The portion of the principal amount of the Debenture included in the Redemption Price that exceeds the face amount of the Debenture is commonly called a "bond premium." The Indenture also provides that the Debentures are convertible at the respective principal amounts thereof into shares of Common Stock of Tandy on certain terms and conditions.

On April 29, 1971, the Board of Directors of Tandy elected to redeem all the outstanding Debentures. The Redemption Date specified by the Board was June 15, 1971. Under the Indenture, each holder of Debentures had the option, during the period ended on the Redemption Date, of presenting such Debentures for redemption in cash or of presenting such Debentures for conversion into Common Stock of Tandy. The economic consequences of an election to be redeemed were different from the consequences of an election to convert. On the Redemption Date, the Redemption Price of a Debenture was 104.75% of the

principal amount of such Debenture, plus 5½ months' interest (i. e., the interest accrued to the Redemption Date). Thus, the Redemption Price of a Debenture in the principal amount of $1,000 was as follows:

| | |
|---|---|
| Principal amount of Debenture | $1,000.00 |
| Bond premium | 47.50 |
| Interest at 5% to June 15, 1971 | 22.78 |
| TOTAL CASH REDEMPTION PRICE | $1,070.28 |

Insofar as conversion is concerned, the Conversion Price up to and including the Redemption Date was $62.03 per share of Common Stock. The market price of the Common Stock on the Redemption Date was $71 per share. The holder of a Debenture in the principal amount of $1,000 electing to convert such Debenture into Common Stock at the Conversion Price of $62.03 per share was entitled to receive 16.12123 shares of Common Stock (computed by dividing the principal amount of the Debenture [$1,000] by the Conversion Price [$62.03] then in effect) having a market value on the Redemption Date of $71 per share. Thus, the value on the Redemption Date of a Debenture in the principal amount of $1,000 to the holder who elected to convert such Debenture into Common Stock was $1,144.61. Clearly, then, conversion was a more favorable economic choice than redemption.

Between April 29, 1971, and June 15, 1971, of the $40,000,000 aggregate principal amount of Debentures outstanding, $39,890,000 principal amount were converted into Common Stock, leaving only $110,000 principal amount of Debentures to be redeemed on the Redemption Date. Tandy's deductions on its income tax return for the fiscal year ended June 30, 1971, for accrued interest and bond premium expense with respect to the $110,000 aggregate principal amount of Debentures that were actually redeemed were allowed on audit and are not at issue in this case.

On January 27, 1976, Tandy filed a claim for a refund in the amount of $1,058,424 for the fiscal year ended June 30, 1971, and a claim for a refund in the amount of $287,-241 for the fiscal year ended June 30, 1972.

By letter dated July 14, 1976, the Internal Revenue Service disallowed both of the refund claims in full. Tandy then instituted this action to recover the amounts claimed, together with interest paid.

## II. ACTION BELOW AND ISSUES PRESENTED ON APPEAL

In terms of specifics, this case presents two separate but related questions. First, is Tandy entitled to deduct for its fiscal year ended June 30, 1971, interest expense of $908,694 on Debentures in the aggregate principal amount of $39,890,000 converted into Common Stock of Tandy by the holders of such Debentures? Second, is Tandy entitled to deduct for its fiscal year ended June 30, 1971, bond premium expense in the amount of $1,894,775 on such Debentures? The disallowance of the $287,241 deduction for the fiscal year ended June 30, 1972, is at issue solely because of the disallowance of the deductions for interest expense and bond premium expense for the fiscal year ended June 30, 1971. Consequently, the determination of the entitlement of Tandy to the claimed deductions for the fiscal year ended June 30, 1971, is dispositive of all issues in this case.

The district court, in its memorandum opinion of January 10, 1979, defined the required legal analysis as follows:

> If the issuance of [Common Stock of Tandy] (to those [D]ebenture holders who exercised their right of conversion to [Common Stock]) is defined or characterized as a *payment* by [Tandy] of the principal, bond premium, and accrued interest of the same nature and character as a *cash payment* had the alternative of cash redemption been exercised by the [D]ebenture holder, then [Tandy] is entitled to federal income tax deductions for the *payment* of the accrued interest and bond premium. However, if the issuance of the [Common Stock] is not defined or characterized as a *payment* of accrued interest or bond premium, but is rather characterized as an *elimination* or *extinguishment* of the [D]ebenture obligation arising under the [Indenture], then [Tan-

dy's] claimed income tax deductions were appropriately disallowed.

1979–1 Tax Cas. (CCH) ¶ 9160, at 86202. The district court turned first to the Indenture and focused on Sections 508 and 1302. The district court noted Tandy's argument that the "Notwithstanding any other provision in this Indenture" introductory language of Section 508 takes precedence over any other provisions of the Indenture dealing with the payment of premium and interest. Tandy further asserted that Section 508 establishes that the conversion of Debentures into Common Stock constituted a payment of premium and accrued interest. The United States, on the other hand, took the position that the "absolute and unconditional" right of the holders language in Section 508 is directed to holders as of the Maturity or Redemption Date, which those holders who converted prior to the Redemption Date were clearly not. Further, the United States contended that the provisions of Section 1302 created an ambiguity in regard to Section 508.

The district court noted that there are two lines of cases which deal with facts similar to those involved in this case, namely *Hummel-Ross Fibre Corp. v. Commissioner*, 40 B.T.A. 821 (1939), and *Shamrock Oil & Gas Co. v. Commissioner*, 42 B.T.A. 1016 (1940), on the one hand, and *Bethlehem Steel Corp. v. United States*, 434 F.2d 1357, 193 Ct.Cl. 459 (1970) and *Columbia Gas System, Inc. v. United States*, 473 F.2d 1244 (2d Cir. 1973), on the other hand. Upon comparison of the facts in this case with the facts existing in *Bethlehem Steel* and in *Columbia Gas*, the district court concluded that the circumstances of the business transaction in this case must be characterized as more analogous to *Bethlehem Steel* and *Columbia Gas* than to the *Hummel-Ross* line of cases. Finally, the district court found that the Indenture was ambiguous, and therefore, that the policy of the *Bethlehem Steel* case should be followed. The Court of Claims in the *Bethlehem Steel* decision focused on the language in the Indenture involved in that case, which also provided that "no adjustment shall be made for interest accrued on any Debenture that

shall be converted," language that is almost identical to the language appearing in the last sentence of the first paragraph of Section 1302 of the Indenture. The Court of Claims found those words to be "fuzzy," 434 F.2d at 1360, and construed the ambiguity against Bethlehem Steel, as the party responsible for the wording of the clause and the Indenture. Finally, the district court found that Tandy's contention that the bond premium should be evaluated differently than the accrued interest was without merit. The district court held that the claim to a bond premium deduction was also controlled by the policy of *Bethlehem Steel*, and distinguished that policy from cases relating to the deductibility of mortgage prepayment penalties as interest expense. In summary, the district court held that under the terms of the Indenture, with any ambiguity construed against Tandy, the issuance of Common Stock of Tandy upon conversion of Debentures was not a payment, but instead a cancellation or discharge, of the accrued interest obligation and the obligation to pay a bond premium, and that the United States had properly disallowed the income tax deductions for interest expense and bond premium expense claimed by Tandy.

On appeal, Tandy argues that the Indenture is not ambiguous, thereby making the policy of *Bethlehem Steel* and *Columbia Gas* inapplicable. In addition, Tandy argues that two other critical factors distinguish this case from the cases relied upon by the district court. In this case, according to Tandy, there was a mutual evaluation of the economics of the conversion exchange by both Tandy and the holders of the Debentures, which is in contrast to the unilateral action by the holders of the debentures which existed in *Bethlehem Steel* and *Columbia Gas*. The second critical distinguishing factor, according to Tandy, is the applicability of the doctrine of constructive receipt by reason of the calling of the Debentures by Tandy. According to Tandy, these three critical factors clearly distinguish this case from the two accrued interest cases (*Bethlehem Steel* and *Columbia*

*Gas*) relied upon by the district court and establish that the accrued interest and bond premium were paid by the delivery of the Common Stock of Tandy. With respect to the bond premium issue, Tandy argues that the district court further erred in failing to treat the bond premium separately from the accrued interest. The district court considered the bond premium to be controlled by the allegedly ambiguous language of a provision in the Indenture relating solely to the treatment of accrued interest and the related policy of the two accrued interest cases, *Bethlehem Steel* and *Columbia Gas*, when, in Tandy's view, the interest provision in the Indenture and the two accrued interest cases have no bearing on the bond premium issue. Finally, Tandy asserts that the district court erred in following *Bethlehem Steel* and *Columbia Gas*, the holdings of which allegedly violate the basic principle of tax law that the substance of a transaction should control its tax consequences. According to Tandy, the substance of the conversion was the payment of the accrued interest and bond premium by the delivery of the Common Stock of Tandy.

## III. CONSTRUING THE INDENTURE

Turning to Tandy's first argument, namely, that the Indenture is not ambiguous, we agree that the Indenture is not ambiguous, but not for the reasons asserted by Tandy. The process of construing a debenture indenture, in this case a 95-page instrument, calls to mind the story of the blind men who were asked to describe the elephant. The moral of that story is that in order correctly to describe an elephant, it is necessary to get a feel for the whole elephant, and the same principle applies to the construction of a debenture indenture.

The basic provision in the Indenture setting forth the terms of the Debentures, including Tandy's obligation to pay interest, is Section 301 of the Indenture, entitled "Title and Terms." The second paragraph of Section 301 defines Tandy's obligation to pay interest on the Debentures during the period from May 1, 1969, until the Stated Maturity of the Debentures. That paragraph does not deal with Tandy's obligation to pay the bond premium or interest if the Debentures are called for redemption, nor does it deal with Tandy's obligation to pay the bond premium or interest if the holder of a Debenture elects to convert such Debenture into Common Stock. The fourth paragraph of Section 301 refers to Article 1100 of the Indenture for the terms on which the Debentures are redeemable, and the sixth paragraph refers to Article 1300 of the Indenture for the terms on which the Debentures are convertible into Common Stock of Tandy.

Turning to the terms on which Debentures are redeemable, we look first to Section 101 of the Indenture, which defines the term "Redemption Price" as the price at which the Debenture is to be redeemed pursuant to the Indenture. We turn then to Section 1101 of the Indenture, subsection (a) thereof, which provides that Tandy may, at its option, redeem all or any part of the Debentures at any time prior to Maturity by payment of the applicable percentage of the principal amount thereof set forth in the form of Debenture contained in Section 202 of the Indenture, *together with accrued interest to the Redemption Date.* Finally, we turn to Section 1107 of the Indenture, which provides that if notice of Redemption has been given as provided in the Indenture, the Debentures to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified. Section 1107, then, is the provision of the Indenture *creating Tandy's obligation* to pay the Redemption Price on the Redemption Date. If we construe the definition of "Redemption Price" together with Sections 1101(a) and 1107 of the Indenture, Tandy's obligation to pay the bond premium and its obligation to pay accrued interest to the Redemption Date (both of which are components of the Redemption Price) exist only *on* the Redemption Date and can logically exist only with respect to Debentures outstanding on such date. Further, in view of the fact that the bond premium and accrued interest are both components of the Redemption Price and the fact that Tandy's

obligation to pay both is dealt with in identical fashion in Section 1107 of the Indenture, Tandy's argument that the bond premium should be treated differently from the accrued interest must fail.

Turning to the terms on which Debentures are convertible, we look first to Section 1301 of the Indenture, entitled "Conversion Privilege and Conversion Price." Section 1301 is the section of the Indenture that creates the conversion privilege on the part of the holders of the Debentures and sets forth the basic mechanism for determining how many shares of Common Stock of Tandy are deliverable upon conversion of a Debenture. The key phrase in Section 1301, for our purpose, is the phrase which provides that any Debenture is convertible "at the principal amount thereof." This phrase means that in determining how many shares of Common Stock of Tandy are deliverable upon the conversion of a Debenture, the Conversion Price (initially, $64.50 per share but subject to adjustment as provided in the balance of Article 1300) is divided into the principal amount of such Debenture. The record reflects that the Conversion Price in effect during the redemption period was $62.03. Accordingly, a Debenture in the principal amount of $1,000 was convertible into 16.12123 shares of Common Stock of Tandy. Section 1301 does not mention accrued interest, nor does it mention bond premium, even though it does specifically address the right of the holder of a Debenture that has been called for redemption. Section 1301 does not provide for augmenting the principal amount of the Debenture by either accrued interest or bond premium. Clearly then, the holder of a Debenture called for redemption (who would be entitled to receive both accrued interest and bond premium, as components of the Redemption Price, if he held such Debenture on the Redemption Date) who elects to convert such Debenture into Common Stock prior to the Redemption Date does not receive any credit upon conversion for the accrued interest or bond premium.

The last sentence of the first paragraph of Section 1302 deals with and negatives Tandy's obligation to pay accrued interest upon conversion or otherwise to make any other adjustment in connection with accrued interest: "No payment or adjustment shall be made upon any conversion on account of any interest accrued on the Debentures surrendered for conversion . . ." Viewed in the context of the entire Indenture before this court, including Section 1301, these words clearly negative the obligation of Tandy to pay accrued interest or make any adjustment in the conversion mechanism to account for it.

In summary, the basic operative provisions of the Indenture that govern the payment of accrued interest and bond premium on Debentures called for redemption but converted into Common Stock prior to the Redemption Date are the definition of "Redemption Price" and Sections 301, 1101(a), 1107, 1301 and 1302. Construed together, they provide unambiguously that, with respect to any Debenture called for redemption, Tandy has an obligation on the Redemption Date to pay accrued interest to the Redemption Date and the applicable bond premium to the holder of a Debenture that is, in fact, redeemed; but Tandy has no obligation to pay accrued interest or bond premium to the holder of a Debenture called for redemption who elects to convert such Debenture into Common Stock prior to the Redemption Date.

Having considered the definition of "Redemption Price" and Sections 301, 1101(a), 1107, 1301 and 1302 of the Indenture, the basic provisions governing the payment of accrued interest and bond premium on Debentures called for redemption but converted into Common Stock prior to the Redemption Date, the question then arises whether Section 508 of the Indenture creates any ambiguity in the Indenture with respect to such payment. We begin by noting that Sections 507 and 508 of the Indenture are identical, for the purposes of this opinion, to Sections 507 and 508 of the Model Debenture Indenture Provisions—All Registered Issues—1967 (the "Model Indenture"), which are considered in the American Bar Foundation's *Commentaries on Indentures.* We turn to the *Commentaries* for a discus-

sion of the purposes of such Sections. In discussing Section 507, entitled "Limitation on Suits," the *Commentaries* state:

> The major purpose of this Section is to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets. The theory is that if the suit is worthwhile, 25% of the debentureholders would be willing to join in sponsoring it. The 25% figure is standard. An additional purpose is the expression of the principle of law that would otherwise be implied that all rights and remedies of the indenture are for the equal and ratable benefit of all the holders.

> Note that this limitation is only on suits under the indenture—the right of a debentureholder to sue on his debenture for payment when due is absolute and unconditional, as provided in Section 508.

> Limitations similar to those contained in Section 507 have been generally upheld by the courts.

> .    .    .    .

> Of course, any suit by one debentureholder seeking to collect the principal of his debenture might prejudice other holders who do not bring such a suit but this kind of action is an absolute right of the debentureholder under the debenture and Section 508 of the Model Provisions. .    .

American Bar Foundation, Commentaries on Indentures 232–34 (1971) (footnote omitted). Going on to Section 508, the *Commentaries* describe the purpose of that Section as follows:

> The provisions of Section 508 are mandatory in a qualified indenture by reason of TIA [Trust Indenture Act of 1939, 15 U.S.C. § 77aaa–77bbbb] § 316(b) [15 U.S.C. § 77ppp(b)]. Provisions of the character of Section 508 were not common in indentures prior to the mid-1920's. Such provisions do, however, appear frequently in indentures in the late 1920's. The purpose of such provisions was to assure the negotiability of the debentures by making certain that the promise to pay contained therein was unconditional.

> TIA § 316(b) refers only to payments on the "due dates expressed in such indenture" and therefore is not applicable to payments due by virtue of a call for redemption. Section 508 is made applicable to such redemption payments under the authority of TIA § 318(b), which provides that provisions additional to those required by the TIA may be included if not in contravention of the TIA provisions.

> .    .    .    .

> In cases where the indenture contains a limitation against suit on the indenture similar to Section 507, but does not contain an express affirmation of the holder's right to sue on the debentures similar to that in Section 508, the courts nevertheless have generally allowed the holder's suit on the debt obligation. Various grounds have been cited in various fact situations, including the inapplicability of an indenture restriction to a holder without actual notice, and the very distinction made by the express reference in the indenture restriction to suits only "under the Indenture."

*Id.* at 234–35 (footnote omitted). It is clear, therefore, from a review of the provisions of Sections 507 and 508 of the Model Indenture and from the discussion of the purpose of those provisions that appears in the *Commentaries*, that the principal function of Section 508 of the Indenture before this court was to assure the negotiability of the Debentures by making certain that the promise to pay contained in the Debentures was unconditional. However, the principal operative provisions setting forth Tandy's obligation to pay principal, premium and interest on the Debentures are contained elsewhere in the Indenture. Specifically, we agree with the United States that Section 508 accurately reflects the provisions of the Indenture discussed above to the effect that Tandy's obligation to pay a bond premium and accrued interest on Debentures called for redemption is an obligation only to the holders of Debentures on the Redemption Date.

## IV. PROPRIETY OF THE DEDUCTIONS

Having concluded that the Indenture clearly and unambiguously provides that Tandy has an obligation to pay accrued interest to the Redemption Date and bond premium to the holder of a Debenture that is, in fact, redeemed, but that Tandy has no obligation to pay accrued interest or bond premium to the holder of a Debenture called for redemption who elects to convert such Debenture into Common Stock prior to the Redemption Date, we come then to the question whether Tandy is entitled to deduct, for federal income tax purposes, accrued interest and bond premium relating to the Debentures in the aggregate principal amount of $39,890,000 that were converted into Common Stock of Tandy prior to the Redemption Date.

Section 163 of the Internal Revenue Code of 1954 permits a deduction from gross income for interest on indebtedness paid or accrued within the taxable year. The Treasury Regulations under I.R.C. § 163 treat bond premium actually paid as a deductible expense. Treas.Reg. § 1.163–3(c). Section 163 does not permit such a deduction, however, for interest obligations that are never paid because they are forgiven, extinguished or otherwise eliminated. *Towers & Sullivan Manufacturing Co. v. Commissioner*, 25 B.T.A. 922 (1932); *McConway & Torley Corp. v. Commissioner*, 2 T.C. 593 (1943). Simply stated, then, the issue in this case is whether the issuance by Tandy of Common Stock upon conversion of Debentures should be treated as the payment of the accrued interest and bond premium that would have been payable in cash had the holders of such Debentures elected not to convert, as Tandy argues, or whether the conversion served to extinguish the claim of the holders of the Debentures to accrued interest and bond premium, as the United States argues and the district court held.

The analysis of the relevant provisions of the Indenture set forth above convinces us that the election by the holder of a Debenture called for redemption to convert such Debenture into Common Stock extinguished the obligation of Tandy to pay those components of the Redemption Price consisting of accrued interest and bond premium. Our conclusion is strongly supported by the decision of the Court of Claims in *Bethlehem Steel* and the decision of the Second Circuit in *Columbia Gas*. *See also Scott Paper Co. v. Commissioner*, 74 T.C. No. 14 (April 28, 1980), reprinted at 74 Tax Ct.Rep.Dec. (P-H) ¶ 74.13 (1980). Both *Bethlehem Steel* and *Columbia Gas* involved the question whether the taxpayer corporation was entitled to a deduction for accrued interest when the holder of a convertible debenture elected to convert such debenture into common stock of the corporation. The indentures contained provisions, similar to the last sentence of the first paragraph of Section 1302 of the Indenture, to the effect that there would be no adjustment in respect of interest on the conversion of any debenture. The Court of Claims in *Bethlehm Steel* and the Second Circuit in *Columbia Gas* concluded that conversion operated to discharge the indebtedness of the issuing corporation for accrued interest rather than to pay such indebtedness. Although neither *Bethlehem Steel* nor *Columbia Gas* involved a redemption situation or a resulting bond premium, the construction by those courts of the provisions of the indentures involved in those cases relating to accrued interest is equally applicable to the provisions of the Indenture relating to the bond premium component of the Redemption Price. Expressed another way, as the analysis of the relevant provisions of the Indenture set forth above demonstrates, the Indenture treats accrued interest and bond premium as components of the Redemption Price, and Article 1300 of the Indenture fails to give any credit upon conversion for either accrued interest or a bond premium. Accordingly, we are of the view that the district court correctly followed the Court of Claims in *Bethlehem Steel* and the Second Circuit in *Columbia Gas* in holding that the conversion of the Debentures served to extinguish the claim which the holders of the Debentures would otherwise have had for accrued interest and bond premium payable on redemption and that

Tandy was, therefore, not entitled to deduct the accrued interest and bond premium under I.R.C. § 163.

Tandy urges upon this court, as it unsuccessfully urged upon the district court, that this case is controlled by *Hummel-Ross* and *Shamrock Oil & Gas*, rather than by *Bethlehem Steel* and *Columbia Gas*. *Hummel-Ross* and *Shamrock Oil & Gas* involved the issuance, in a corporate reorganization, of capital stock in exchange for bonds and past-due interest thereon. The Board of Tax Appeals permitted the deduction of the past-due interest which was, in effect, paid through the issuance of capital stock. *Hummel-Ross* and *Shamrock Oil & Gas* must be viewed as turning on the fact that they involved a new bargain struck by the holders of the bonds (who were entitled, under the terms of the bonds, to receive the past-due interest) to accept capital stock in exchange for the past-due interest. Such an analysis simply does not apply in circumstances (such as those presented here) where the terms of the conversion were fixed in advance at the time the Debentures were issued. In *Bethlehem Steel*, the Court of Claims was presented with the argument that the *Hummel-Ross* line of cases governed and rejected that argument, stating that "since the terms were all pre-fixed, there could not have been a mutual *ad hoc* evaluation and trade-off of relevant elements at the time of the conversion-exchange." 434 F.2d at 1359. *See also Columbia Gas*, 473 F.2d at 1248.

In yet another effort to dissuade us from relying on *Bethlehem Steel* and *Columbia Gas*, Tandy argues that this case is distinguishable from *Bethlehem Steel* and *Columbia Gas* because in this case there was a mutual evaluation (similar to the evaluations which occurred in the *Hummel-Ross* line of cases) of the economics of the conversion by both Tandy and the holders of the Debentures which is allegedly in contrast to the unilateral action by the holders of the debentures which existed in *Bethlehem Steel* and *Columbia Gas*. We must assume, however, that the holders of the debentures in both *Bethlehem Steel* and *Columbia Gas* were fully aware of the amount of accrued interest that they would forego if they exercised their conversion right and took this factor into account in deciding whether or not to exercise that option. In this case, as in *Columbia Gas* and *Bethlehem Steel*, the conversion right was presumably exercised because the holders thought it economically advantageous to do so. We agree with the United States, however, that the critical factor in this regard is that, regardless of what factors the holders may have taken into account in deciding to convert (and regardless of any factors that Tandy may have taken into account in calling the Debentures for redemption), the actual terms of the conversion remained wholly unaffected by the amount of accrued interest as of that time or the fact that a bond premium would have become payable if the Debentures had not been converted. In short, the converting Debenture holders received nothing more or less than what they would have received on conversion in other circumstances, and the cases of *Columbia Gas* and *Bethlehem Steel* are, on this point, indistinguishable.

▮ Tandy then invites us to apply the doctrine of constructive receipt in this case, an invitation which we are sure would be viewed with dismay by the former Debenture holders—now Tandy stockholders—who received a total of approximately 5,480,000 shares of Common Stock of Tandy on conversion of the Debentures. Specifically, Tandy argues that by reason of the fact that the holders of the Debentures were entitled to receive principal, premium and interest in the form of cash because of the call for redemption, they were in constructive receipt of these funds. According to Tandy, the doctrine of constructive receipt treats as taxable income that which is unqualifiedly subject to the demands of a taxpayer on the cash receipts and disbursements method of accounting, whether or not such income has actually been received in cash. Since the holders of the Debentures are considered by Tandy to have been in constructive receipt of these funds, Tandy must be considered to have paid such

amount in the form of stock, thus entitling it to deductions for the bond premium and accrued interest attributable to the Debentures surrendered for Common Stock of Tandy. One clue to the strength of Tandy's argument may be the fact that the portion of its brief in which this argument is advanced cites no authority other than a First Circuit case (*Ross v. Commissioner*, 169 F.2d 483 (1948)) and Treas.Reg. § 1.451–2, both of which simply define the doctrine of constructive receipt. No authority is cited for the specific proposition that the doctrine of constructive receipt should be applied to a Debenture holder who elects to convert and thereby to forfeit accrued interest or bond premium. To begin with, the doctrine of constructive receipt pertains not to the allowance of deductions, but rather to the timing of the inclusion in gross income of items over which the taxpayer has unfettered command. *See, e. g., United States v. Hancock Bank*, 400 F.2d 975 (5th Cir. 1968). In our case, the question is whether Tandy is entitled to deductions for amounts which were not paid in the tax year in question and which, as a result of conversion, would never be paid.

■ The applicable standard for the accrual of deductions is the "all events test" announced by the Supreme Court in *United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347 (1926). *See* Treas. Reg. § 1.461–1(a)(2). The basic rule is that before an expense becomes deductible, all events which fix the amount and liability of the taxpayer must have occurred. As the Supreme Court explained in *Dixie Pine Products Co. v. Commissioner* :

> It has long been held that in order to truly reflect the income of a given year, all the events must occur in that year which fixed the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid.

320 U.S. 516, 519, 64 S.Ct. 364, 365, 88 L.Ed. 270 (1944). In the case before this court, when Tandy called the Debentures for redemption, the possibility existed that all the holders of the Debentures would elect to allow the Debentures to be redeemed rather than to convert the Debentures into Common Stock of Tandy. But all the events necessary to fix Tandy's liability to pay the Redemption Price (including the accrued interest and bond premium), *i. e.*, the surrender of all the Debentures for redemption, had not and, in the case of all but $110,000 principal amount of the Debentures, did not occur.

Even from the viewpoint of the holder of a Debenture, the constructive receipt doctrine would not apply in this case. If it did, of course, the holder would be taxable on the accrued interest and bond premium to the same extent as if he had surrendered the Debenture for redemption. But, in fact, the holders of the Debentures at issue in this case were in the same position as the holders of the Debentures involved in *Bethlehem Steel* and *Columbia Gas*. If they had retained the Debentures, instead of converting them, they would have received the accrued interest and bond premium in cash. But to do so, the holders would have been required to give up their right to convert the Debentures into an equity investment in Tandy. In short, the cash was not simply theirs for the taking, but was theirs for the taking only if they would forego their right to acquire Common Stock of Tandy at a price below the market value. Some of the holders elected to do so, but the majority did not. Instead, the majority gave up their right to payment of principal, accrued interest and bond premium in order to transform their debt security into an equity security. The doctrine of constructive receipt does not apply in these circumstances. *See, e. g., Cohen v. Commissioner*, 39 T.C. 1055, 1063 (1963).

Further, like the "all events test," the constructive receipt doctrine is essentially concerned with matters of timing. While it may serve to prevent taxpayers from postponing the recognition of income which in fact is freely available to them in an earlier year, it does not require the recognition of income that, in fact, will never be received because the obligation owed to them is actually cancelled during the taxable year in question. Thus, the constructive receipt

doctrine provides no basis for charging the holders of the Debentures with income they did not and would never receive, as Tandy has invited us to do. By the same token, it cannot be utilized to justify Tandy's deduction of expenses it did not—and never would—actually pay.

Finally, Tandy urges that the district court erred in following *Bethlehem Steel* and *Columbia Gas*, the holdings of which allegedly violate the basic principle of tax law that the substance of a transaction should control its tax consequences. According to Tandy, the substance of the conversion was the payment of the accrued interest and bond premium by the delivery of the Common Stock of Tandy. Tandy's invitation to consider substance over form is mistaken strategy since under that doctrine, Tandy clearly loses. The holders of the Debentures who elected to convert such Debentures into Common Stock did not actually receive payment of the accrued interest or bond premium in question. Further, the amount of Common Stock that they received was not increased by virtue of the accrued interest or bond premium. Tandy did not incur any actual cost of borrowing attributable to the accrued interest or bond premium. Accordingly, if substance is to govern over form, Tandy was clearly not entitled to the deductions for accrued interest and bond premium which it claims.

## V. CONCLUSION

In summary, Tandy is not entitled to deduct the accrued interest and bond premium that would have been payable to the holders of Debentures in the aggregate principal amount of $39,890,000 upon redemption thereof had such holders not elected to convert such Debentures into Common Stock of Tandy for the reason that such accrued interest and bond premium were not "paid" within the meaning of I.R.C. § 163. The election of the holders of such Debentures to convert such Debentures into Common Stock of Tandy served to extinguish the obligation of Tandy to pay such accrued interest and bond premium.

AFFIRMED.

## APPENDIX

SECTION 101. *Definitions.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

.        .        .        .

*"Interest Payment Date"* means the Stated Maturity of an installment of interest on the Debentures.

.        .        .        .

*"Maturity"* when used with respect to any Debenture means the date on which the principal of such Debenture becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

.        .        .        .

*"Redemption Date"* when used with respect to any Debenture to be redeemed means the date fixed for such redemption by or pursuant to this Indenture.

*"Redemption Price"* when used with respect to any Debenture to be redeemed means the price at which it is to be redeemed pursuant to this Indenture.

*"Regular Record Date"* for the interest payable, and punctually paid or duly provided for, on any Interest Payment Date shall be the close of business on the 15th day (whether or not a Business Day) of the calendar month next preceding such Interest Payment Date.

.        .        .        .

*"Stated Security"* when used with respect to any Debenture or any instalment of interest thereon means the date specified in such Debenture as the fixed date on which the principal of such Debenture or such instalment of interest is due and payable.

.        .        .        .

SECTION 301. *Title and Terms.*

The aggregate principal amount of Debentures which may be authenticated and delivered under this Indenture is limited to $40,000,000 except for Debentures authenti-

cated and delivered upon registration of transfer of, or in exchange for, or in lieu of other Debentures as provided herein.

The Debentures shall be known and designated as the "5% Convertible Subordinated Debentures Due 1989" of the Company. Their Stated Maturity shall be May 1, 1989 and they shall bear interest from May 1, 1969, or from the most recent Interest Payment Date to which interest has been paid or duly provided for, payable on July 1, 1969 and semi-annually thereafter on January 1 and July 1 in each year and at the Stated Maturity of the principal hereof, at the rate of 5% per annum until the principal hereof becomes due and payable, and at the rate of 6% per annum on any overdue principal and premium and (to the extent that the payment of such interest shall be legally enforceable) on any overdue instalment of interest.

The principal (and premium, if any) and interest on the Debentures shall be payable at the office or agency of the Company in the Borough of Manhattan, The City of New York, New York provided for in *Section 1002* (herein called the "*Place of Payment*"); provided, however, that payment of interest may be made at the option of the Company (a) by check mailed to the address of the Person entitled thereto at such address as shall appear on the Debenture Register or (b) in such other manner acceptable to the Trustee as the Person entitled thereto may have requested.

The Debentures shall be redeemable as provided in *Article 1100* and shall be entitled to the benefits of, and be redeemable for, the sinking fund as provided in *Section 1101*.

The Debentures shall be subordinated in right of payment to Superior Debt as provided in *Article 1200*.

The Debentures shall be convertible into common stock of the Company as provided in *Article 1300*.

.     .     .     .

SECTION 307. *Payment of Interest; Interest Rights Reserved.*

Interest on any Debenture which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Debenture (or one or more Predecessor Debentures) is registered at the close of business on the Regular Record Date for such interest; provided, however, if any Debenture or portion thereof is called for redemption and is payable on a date after the close of business on a Regular Record Date next preceding any Interest Payment Date and before the opening of business on such Interest Payment Date, and notice of such redemption has been mailed and funds for such redemption have been duly provided, interest accrued to the date fixed for the redemption of such Debenture or portion so called shall be paid only against surrender of the Debenture.

.     .     .     .

.     .     .     .

SECTION 507. *Limitation on Suits.*

No Holder of any Debenture shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless

(1) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(2) the Holders of not less than 25% in principal amount of the Outstanding Debentures shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(3) such Holder or Holders have offered to the Trustee reasonable indemnity against the costs (including reasonable counsel fees), expenses and liabilities to be incurred in compliance with such request;

(4) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5) no direction inconsistent with such written request has been given to the Trustee during such 60 day period by the

Holders of a majority in principal amount of the Outstanding Debentures;

it being understood and intended that no one or more Holders of Debentures shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Debentures, or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Debentures.

**SECTION 508.** *Unconditional Right of Debentureholders to Receive Principal, Premium, Interest and to Convert.*

Notwithstanding any other provision in this Indenture, the Holder of any Debenture shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and (subject to *Section 307* interest on such Debenture on the respective Stated Maturities expressed in such Debenture (or, in the case of redemption, on the Redemption Date) and to convert such Debenture in accordance with *Article 1300* and to institute suit for the enforcement of any such rights, and such rights shall not be impaired without the consent of such Holder.

. . . .

**SECTION 1101.** *Right of Redemption.*

(a) The Company may, at its option, redeem all or any part of the Debentures at any time prior to Maturity by payment of the applicable percentages of the principal amount thereof set forth in the form of Debenture contained in *Section 202* hereof, together with accrued interest to the Redemption Date.

. . . .

. . . .

**SECTION 1107.** *Debentures Payable on Redemption Date.*

Notice of redemption having been given as aforesaid, the Debentures so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified and on and after

such date (unless the Company shall default in the payment of the Redemption Price and accrued interest, if any) such Debentures shall cease to bear interest. Upon surrender of such Debentures for redemption in accordance with said notice, such Debentures shall be paid by the Company at the Redemption Price. Instalments of interest whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Debentures registered as such on the relevant Record Dates according to their terms and the provisions of *Section 307.*

. . . .

**SECTION 1301.** *Conversion Privilege and Conversion Price.*

Subject to and upon compliance with the provisions of this Article, at the option of the Holder thereof, any Debenture or any portion of the principal amount thereof which is $1,000 or an integral multiple of $1,000, may, at any time at or before the close of business on May 1, 1989, or in case such Debenture or portion thereof shall have been called for redemption prior to such date, then in respect of such Debenture or such portion thereof until and including, but (unless the Company shall default in payment due upon the redemption thereof) not after, the close of business on the Redemption Date, be converted at the principal amount thereof, or of such portion thereof, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of common stock of the Company, at the Conversion Price, determined as hereinafter provided, in effect at the time of conversion.

The price at which shares of common stock shall be delivered upon conversion (herein called the *"Conversion Price"*) shall be initially $64.50 per share of common stock. The Conversion Price shall be adjusted in certain instances as provided in *Section 1304.*

**SECTION 1302.** *Manner of Exercising Conversion Privilege.*

In order to exercise the conversion privilege, the Holder of any Debenture to be

converted shall surrender such Debenture, duly endorsed or assigned to the Company or in blank (if so required by the Company), at the office or agency of the Company maintained for that purpose pursuant to *Section 1002*, accompanied by written notice to the Company at said office or agency that the holder elects to convert such Debenture or, if less than the entire principal amount thereof is to be converted, the portion thereof to be converted. Such notice shall also state the name or names (with address and taxpayer identification number) in which the certificate or certificates for shares of common stock of the Company issuable on such conversion shall be issued. Debentures surrendered for conversion during the period from the close of business on any Regular Record Date next preceding any Interest Payment Date to the opening of business on such Interest Payment Date shall (except in the case of Debentures or portions thereof which have been called for redemption on a Redemption Date within such period) be accompanied by payment in New York Clearing House funds or other funds acceptable to the Company of an amount equal to the interest payable on such Interest Payment Date on the principal amount of Debentures being surrendered for conversion. The funds so deposited shall be paid to the Company on or after such Interest Payment Date or, if the Company shall default in the payment of the interest due on the Debentures on such Interest Payment Date, such funds shall be repaid to the Holders who deposited the same. No payment or adjustment shall be made upon any conversion on account of any interest accrued on the Debentures surrendered for conversion or on account of any dividends on the common stock issued upon conversion.

Debentures shall be deemed to have been converted immediately prior to the close of business on the day of surrender of such Debentures for conversion in accordance with the foregoing provisions, and at such time the rights of the Holders of such Debentures as Holders shall cease (except to the extent that such Holders or the Holders of any Predecessor Debentures shall be entitled to receive interest on such Debentures pursuant to the last paragraph of *Section 307*), and the Persons entitled to receive the common stock issuable upon conversion shall be treated for all purposes as the record holder or holders of such common stock at such time; provided, however, that any such surrender on any date when the stock transfer books of the Company shall be closed shall constitute the Person or Persons in whose name or names the certificate or certificates for such shares are to be issued as the record holder or holders thereof for all purposes at the opening of business on the next succeeding day on which such stock transfer books are open and the Debentures surrendered shall not be deemed to have been converted, in whole or in part as the case may be, until such date for the purpose of determining whether any interest is payable thereon, and such conversion shall be at the actual Conversion Price in effect at such date. As promptly as practicable on or after the conversion date, the Company shall issue and shall deliver at said office or agency a certificate or certificates for the number of full shares of common stock issuable upon conversion, together with payment in lieu of any fraction of a share, as provided in *Section 1303*.

In the case of any Debenture which is converted in part only, upon such conversion the Company shall execute and the Trustee shall authenticate and deliver to the Holder thereof, at the expense of the Company, a new Debenture or Debentures of authorized denominations in principal amount equal to the unconverted portion of such Debenture.